**In the Interests of Kelly HARRIS [1]**
**DOB: 05/31/1989**

**Susan Harris DOB: 08/16/1992**

**Walter Harris DOB: 05/06/1994.**

**No. CS96–03637.**

Family Court of Delaware,
Sussex County.

Submitted: Oct. 17, 2005.

Decided: Feb. 3, 2006.

---

1. Pseudonyms have been used to protect the     litigants.

Earnest and Ruby Harris of Harbeson, DE, Petitioners, Pro Se.

Doris Harris of Millsboro, DE, Respondent, Pro Se.

## OPINION

JONES, Judge.

It is hard to imagine a more contentious case involving a dispute between parent and grandparents than the pending litigation. The first entry in the Family Court file goes back almost ten years. The Court believes that a review of that file is necessary in order that a true picture of this litigation can be obtained.

### BACKGROUND

Earnest and Ruby Harris (paternal grandparents[2]) first filed a Petition for Grandparent Visitation in April of 1996. They had apparently been denied contact with their three grandchildren, Kelly A. Harris (Kelly) (DOB 05/31/1989), Susan Harris (DOB 08/16/1992) and Walter D. Harris (DOB 05/06/1994). The respondents in the petition were the children's parents, Doris Harris (mother) and Samuel Harris (father).

On June 12, 1996, the parties entered into a Permanent Consent Order concerning grandparent visitation. Paternal grandparents were to enjoy visitation every other Saturday from 10:00 a.m. through 6:00 p.m.

On April 30, 1997, Ruby Harris individually filed a Petition for Modification of Step-grandparent Visitation. Apparently, she and Earnest Harris where not receiving their court-ordered visitation. It is unclear to this Court why Earnest Harris did not join in the filing.

Ten days later, on May 9, 1997, paternal grandparents jointly filed a Petition for Modification of Grandparent Visitation.

On February 10, 1998, paternal grandparents filed a motion to withdraw their visitation petition. Apparently, relations between the parties had improved.

On April 15, 2002, Earnest Harris filed a Petition for Grandparent Visitation against mother. Father had passed away on March 12, 2002. Earnest Harris alleged that he had been denied contact with the children. The petition was voluntarily dismissed by Earnest Harris on May 31, 2002.

On August 14, 2002, paternal grandparents filed a Petition for Rule to Show Cause against mother. They alleged that mother was in violation of the permanent consent visitation order dated June 12, 1996. A hearing was held on December 11, 2002. A Commissioner of this Court recognized the right of parental grandparents to continue to have visitation with their grandchildren, pursuant to the June 12, 1996 Order. Visitation was to recommence on January 11, 2003.

On December 31, 2002, mother filed a Petition for Stay/Termination of Visitation with this Court. Attached to the petition was a letter of therapist Carolyn Gover, recommending that no grandparent visita-

---

**2.** Earnest Harris is the biological grandfather of the minor children. He is the biological father of Samuel Harris. Ruby Harris is the wife of Earnest Harris.

tion occur. Also attached to the petition were affidavits from the three children, stating that they did not wish to have visitation with paternal grandparents. A request for emergency *ex parte* relief, accompanying the petition, was denied.

On February 13, 2003, paternal grandparents filed a Petition for Rule to Show Cause, alleging that they were being denied court-ordered visitation. Following a teleconference with counsel on April 4, 2003, the Court scheduled both petitions for a hearing on July 8, 2003. Court records indicate that on April 16, 2003, paternal grandparents obtained new counsel. Almost immediately, paternal grandparents' new attorney requested a continuance of the scheduled hearing. The request was denied. Again, on July 17, 2003, the attorney for paternal grandparents requested a continuance, alleging that counsel would be on maternity leave on the date of the scheduled hearing. By Court Order dated June 19, 2003, the Court continued the July 8 hearing.

On July 26, 2003, paternal grandparents filed a Dependency/Neglect Petition for Custody. In it, they alleged that the children were dependent and neglected in the care of mother. They requested sole custody of the children.

On September 17, 2003, this Court issued an Order in response to a Motion for Custodial and Psychological Evaluations, filed by paternal grandparents. The Court denied a request for psychological evaluations of paternal grandparents and mother. The Court denied the request for custody evaluations. The Court directed that the minor children should undergo psychological examinations, since the children's mental health was an issue in controversy.

A hearing was scheduled before the Court on all pending matters for October 21, 2003. Counsel for paternal grandparents requested a continuance, so that the children's psychological evaluations could be completed. The hearing was rescheduled for January 27, 2004. Evidence was presented that day, but the hearing was not completed. On March 26, 2004, the Court received a motion from the Office of the Child Advocate, requesting that the Court appoint Denis P. Casey, Esquire, as attorney guardian *ad litem* for the minor children. On April 23, 2004, the Court issued such an Order.

The Court scheduled May 11 and May 12, 2004, as dates for the presentation of additional testimony. Both the attorney guardian *ad litem* and mother requested a continuance. All counsel agreed that a continuance was appropriate. The Court scheduled a pre-trial teleconference with counsel for July 9, 2004. The Court also indicated that a hearing would reconvene on September 7 and 10, 2004.

On July 21, 2004, following a request by the attorney guardian *ad litem*, the Court directed that a child custody evaluation with respect to all three minor children be performed by Dr. Samuel Romirowsky, Ph. D.

On July 22, 2004, this Court issued a Rule to Show Cause, directing mother to appear on August 13, 2004, in order to respond as to why she should not be held in contempt of prior Orders of this Court for failure to make her children available to meet with the attorney guardian *ad litem*.

On August 13, 2004, the Court conducted a show cause hearing, and found mother to be in violation of prior orders of this Court. The Court directed that mother make the children available to meet with Mr. Casey on specific dates in the future.

On September 2, 2004, the Court issued an Order, referencing the upcoming hearing dates. Discussions with counsel

indicated that Dr. Romirowsky would be unable to testify before the Court on September 7 and September 10, 2004, because his work had not yet been completed. The Court continued the matter, and scheduled hearing dates for February 14 and February 15, 2005. Evidence was presented to the Court on those dates. The Court also received evidence on September 12, September 13 and October 17, 2005.

On June 15, 2005, the Court issued a written Order, addressing the completion of the custody evaluation. The Court noted that at the February 15 hearing, mother had agreed to cooperate in the completion of the custody evaluation with Dr. Romirowsky. The Court noted that it had verbally directed mother at the end of the February 15 hearing to complete the custody evaluation. The Court also referenced discussions at the end of the February 15 hearing, that mother would cooperate in allowing the attorney guardian *ad litem* to have access to the children.

The June 15 Order also directs that paternal grandparents and mother participate in counseling. Finally, it provides that interim supervised grandparent visitation occur at the Georgetown Visitation Center, once every other week. A referral was made to the Visitation Center by the Court.

On September 13, 2005, the Court issued an oral interim order, directing that mother contact the Peoples Place II Visitation Center in Georgetown, so that visitation between the minor children and paternal grandparents could begin no later than Sunday, September 24, 2005.

On October 24, 2005, this Court issued an Interim Order, directing that mother make immediate arrangements for the children to visit with paternal grandparents at the Georgetown Visitation Center.

Throughout these proceedings, paternal grandparents have been represented by Elizabeth Y. Olsen, Esquire. With the exception of the initial hearing date on January 27, 2004, Denis P. Casey, Esquire, has appeared as the attorney guardian *ad litem* for the minor children. Mother retained legal counsel, William B. Wilgus, Esquire, for the initial hearing date of January 27, 2004. The Court thereupon allowed Mr. Wilgus to withdraw from the matter. Although mother retained the services of two additional attorneys on two occasions in these proceedings, both have withdrawn, and mother has appeared *pro se* at all other hearing dates.

## EVIDENCE PRESENTED

*January 27, 2004 Witnesses:*

1. Dr. Samuel Romirowsky

At the first day of the hearing, Dr. Samuel Romirowsky testified concerning his efforts to conduct a psychological evaluation of the children in the fall of 2003. Dr. Romirowsky is a license psychologist in Delaware and Pennsylvania, with 23 years of practice. His office is in Newark, Delaware.

Dr. Romirowsky testified as to his efforts to coordinate the children's evaluation through mother. He first heard from mother by telephone on December 4, 2003. Mother stated that it was her belief that a custody evaluation was to occur. This caused some confusion, because he did not realize this was the same case for which he was to perform psychological evaluations on the children. Dr. Romirowsky described the process for a custody evaluation, and stated that he wanted to meet with mother. Mother resisted. Dr. Romirowsky then contacted mother's attorney, and was reminded why he was being retained.

Dr. Romirowsky then contacted mother, possibly on December 5th, to tell her about the process of performing psychological evaluations of the children. He informed mother that Dr. Fardman would contact her to set up three different days for the children to undergo psychological testing, and for the children to thereafter meet with Dr. Romirowsky. Mother stated that there were certain limitations on her time.

Dr. Romirowsky and Dr. Fardman are not in practice together, but Dr. Romirowsky subcontracts psychological testing to Dr. Fardman. Dr. Romirowsky believes that he immediately informed Dr. Fardman about the case, and relied on Dr. Fardman to set up specific testing dates.

Dr. Romirowsky testified that the initial appointment for Susan with Dr. Fardman was January 5, 2004, the initial appointment for Walter was January 14, 2004, and the initial appointment for Kelly was January 16, 2004.

On January 5, 2004, mother called Dr. Romirowsky and left a voice mail message. She said that Susan was sick, and that she was taking her to the doctor. She would not be attending the testing. The testing was rescheduled for January 12, 2004.

On January 12, 2004, Susan was still sick. On January 14, 2004, mother called and stated that she and the children were all sick.

Prior to the January 16 appointment for Kelly, the witness contacted the attorney for paternal grandparents. He expressed concern that, already, nine hours of appointment time had been missed. He questioned whether Kelly would be well in time for the January 16 appointment. Dr. Romirowsky cancelled the appointment.

## 2. Dr. Erwin Fardman

Erwin Fardman is a clinical psychologist, licensed to practice in Pennsylvania. He is permitted to practice in Delaware under the supervision of a Delaware licensed psychologist.

Dr. Fardman stated that he was referred this matter by Dr. Romirowsky, in order to conduct psychological testing. His first contact with mother was on December 15 or 16, 2003. He suggested several dates for meeting with the children in December, and additional dates beginning on January 5, 2004. Mother responded that she had conflicting appointments in December. She was able to schedule a first appointment on January 5, 2004.

At 9:50 a.m. on January 5, 2004, mother called and said that it was raining. She had a missing taillight, and could not drive. An appointment was made for January 12, 2005. On that date, at 9:15 a.m., mother called and stated that Susan was sick, and that she had to take the child to the doctor.

On January 14, 2004, when mother had scheduled an appointment for Walter, mother called at 8:10 a.m., and said that all three children, as well as mother, were sick. The witness thereupon called Dr. Romirowsky, and it was decided to cancel the January 16, 2004 appointment.

Dr. Fardman stated that testing of the children would have taken approximately three hours each.

## 3. Doris Harris

Mother testified that she is 43 years old, and resides in Millsboro, Delaware, in a four-bedroom ranch home. All three children live with her.

Her ex-husband, Samuel Harris, who is now deceased, is the biological father of all children. They resided together at the time each of the children was born. They separated in 1995, and divorced in 1996.

Father died on March 15, 2002. Prior to his death, the children resided with mother.

Mother testified that from 1996 through 2002, there was no regular visitation between paternal grandparents and the children. Father had visitation every other weekend, and Wednesday evenings. At times, he exercised his visitation. Paternal grandparents sometimes saw the children during father's visits. They also interfered with father's visits, demanding that the children come to their home. Mother objected to the children visiting with paternal grandparents when they were supposed to be visiting with father, because the children did not want to visit them. She stated that the last time paternal grandparents had contact with the children was at the time of father's death. She does not think that visitation with paternal grandparents is appropriate, and does not want it to occur.

With respect to appointments with Dr. Romirowsky and Dr. Fardman, mother stated that she started calling Dr. Romirowsky's office in November. She finally reached him in early December. With respect to the January 5 appointment, she started out from her home, and had problems with her vehicle. She attempted to get a rental, but eventually had to cancel. On January 12 and January 14, the children and mother were sick. She was forced to cancel the appointments. Mother contends that the children received medical treatment during that time.

Mother stated that she is employed with the Army National Guard. She was unable to describe her exact duties. She commented that she has difficulty rearranging her military work schedule.

On cross-examination, mother admitted that the children lived with paternal grandparents for a period of time in the spring or summer of 2002. They also lived with their father. This was because father made accusations against mother. The two younger children returned to mother's care in approximately four months. Kelly stayed a little longer with paternal grandparents.

Mother recognized the existence of the June 1996 Court Order, awarding paternal grandparents visitation. She testified, however, that it was her position that paternal grandparents should have visited with the children when father exercised his visitation. She expressed her opinion that the Commissioner's Order of December, 2002, did not recognize the authority of paternal grandparents to visit with the children. In fact, she testified that she does not believe that there is any Order which gives paternal grandparents the right to visit. Mother admits that following father's death, she denied paternal grandparents visitation. She commented that she was "hit in the line of duty" at about the time of father's death. By further explanation, she stated that she was in an automobile accident while on her way to military duty.

Mother commented that she was in the Army band for ten years. She is now in a reserve unit out of Dagsboro. She is a tech specialist, which is a clerical position. She has no other employment.

Mother resides in the Indian River School District. She stated that Kelly is home-schooled by mother, and has been home-schooled since September of 2003. Kelly started the ninth grade at Cape Henlopen High School as a resource student. Mother withdrew her to be home schooled. Walter attends Long Neck Elementary School. Susan goes to Sussex Central Middle School.

### 4. Kelly Harris

Kelly, age fourteen, stated that she enjoys being home-schooled in the ninth

grade. She stated that she does not want to visit her paternal grandparents, because they locked her and her siblings out of the house; because she was not permitted to attend her father's funeral; because Ruby has dug her fingers into her; because Ruby has made her wear clothing that she did not want to wear; and because Ruby has hit the children. She stated that she has not visited paternal grandparents for two or three years, and she will refuse to visit them in the future.

On cross-examination, Kelly testified that she began home-schooling in December of 2003. She believes that she is getting a better education than in public school. On a typical day, she studies four subjects, for one and one-half hours each. She believes that her papers are sent off to the Board of Education to be graded.

Kelly testified that her paternal grandparents locked her and her siblings out of the house on a summer day, possibly in the year 2000. They hit the children when the children would not listen. They stopped the children from attending their father's funeral. She further stated that she and her siblings attended their father's viewing, and were told that they could attend the funeral the next day. However, when they entered the church for the funeral with their aunt and uncle, they were told to leave through a side door.

### 5. Susan Harris

Susan is in the sixth grade, and is eleven years old, attending Sussex Central Middle School. She is doing well in school. She stated that she does not think that visitation should occur with paternal grandparents. She believes that they have mistreated the children. She has felt threatened. She stated that Ruby has hit her. She stated that Ruby locked her in a closet two years ago when she was living with paternal grandparents.

Susan testified that she is concerned that this treatment will continue. She commented that Ruby made her wear strange clothing.

Susan stated that she gets along well with mother. Everything is okay at home.

On cross-examination, Susan stated that she did not know why Ruby hit her. She does not remember why she was locked in a closet. She does not like paternal grandparents telling her what to do.

Susan testified that she is generally getting A's and B's in school, although she may be getting a C or D in math. She stated that mother takes her horseback riding and spends a lot of time with her. She believes that paternal grandparents kicked them out of father's funeral.

### 6. Walter Harris

Walter is nine-years-old. He attends Long Neck Elementary School. He stated that he does not want to visit with paternal grandparents. He has been hit by a metal spoon and yard stick. He has been locked outside. His sisters have been locked in a closet. These things happened during visits, and when he lived with paternal grandparents. He is afraid that there may be repeat incidents.

Walter stated that he gets along well with mother, and there are no problems at home.

On cross-examination, Walter admitted that mother has discussed his testimony with him. During his last visit with paternal grandparents, the police came to the house, because there was a Court Order. Walter admitted that he called paternal grandparents in 2003, at the direction of mother, to tell them that he did not want to see them anymore.

Walter stated that he loves Earnest Harris, but does not love Ruby Harris.

He does not want to see Earnest Harris again. At his own home, he has fun, goes out to play, and has friends.

*February 14, 2005 Witnesses:*

7. Lou Ann Riley

Lou Ann Riley was contacted by mother in September of 2004 in order to educate Kelly. Ms. Riley operates Jubilee Christian Academy in Millsboro, a private school in her home. Kelly was at about the eighth grade level, but the academy does not place children in actual grades. Ms. Riley testified that she has taught Kelly since September.

Ms. Riley stated that Kelly has learning challenges, and has benefited from the school. She interacts well with other students. She is not withdrawn. She has sensitivity to the needs of other children. There are no signs of abuse.

On cross-examination, Ms. Riley stated that Kelly is self-motivated. She is not in possession of Kelly's prior school record, however. Mother told Ms. Riley that Kelly was very unhappy in public school. Kelly seems obedient to mother. Mother is very cooperative with the child's education. Kelly has an interest in thoroughbred horses.

8. Susan Taylor–Walls

Susan Taylor–Walls of the Division of Family Services was called by the attorney guardian *ad litem*. She provided the Court with records of the Harris children, from 1996 through 2003. The records were accepted into the record, subject to the Court determining relevancy and hearsay issues. There are no pending DFS matters with the family.

9. Richard Greer

Richard Greer, mother's brother, testified. He stated that on March 12, 2002, he escorted the children to their father's funeral. They were not allowed to stay. Outside the church, he saw paternal grandparents. They said that it was a shame that the children could not attend the funeral service. They offered that Mr. Greer could allow the children to follow the funeral procession. They could not attend the gravesite service, however.

Mr. Greer stated that he eventually took the children to the gravesite, after everyone had left the burial.

Mr. Greer stated that this case is having an emotional effect on the children.

When asked to rate mother as a parent, on a scale of one to ten, he said that mother is a seven or an eight.

On cross-examination, Mr. Greer stated he was unaware that mother had initiated the Court proceedings. He believes that the children have a fear of being taken from mother. This places them in constant turmoil.

He testified that mother has a residence in both the Indian River School District and the Cape Henlopen School District. One residence is on Sand Hill Road outside Georgetown, and the other is near Millsboro. Mother stays at both places. Mother is building a home on Sand Hill Road, but no construction has actually begun. When mother stays on Sand Hill Road, she is staying with her sister. Other family members live nearby on Sand Hill Road. He believes that mother moved to the Sand Hill residence at the beginning of the 2004–2005 school year. He stated that he sees mother once or twice each week.

Mr. Greer is not aware that mother has done anything to promote a relationship between the children and paternal grandparents. Mother has not discussed with him any ideas that would promote a rela-

tionship between the children and paternal grandparents.

Mr. Greer stated that the children need to be removed as an object of controversy between mother and paternal grandparents. He stated that the children "have been caught in the middle of a very bad thing." He admitted that the children need counseling to help them adjust to life.

Mr. Greer testified that the children see their maternal grandparents frequently. They have a lot of contact with other family members.

Mr. Greer testified that mother has had neck and leg surgery in the past few years. She takes medication for pain in her back. She is also on an anti-depressant. She drinks beer occasionally. Mother's relationship with the children's father included domestic violence. He is not clear whether the children were present during acts of domestic violence.

10. Doris Harris

Mother was called to testify by paternal grandparents. She stated that she lives at Sand Hill Road, at a residence with her sister, Sally Johnson. The three children live there, as well as Ms. Johnson's son, Hunter Greer, who is twelve years of age. Walter shares a room with Hunter. She has lived there since July of 2004, after she returned from a two month deployment in Italy. While she was gone, her father held a power of attorney over the children.

Mother stated that she is injured, and receives physical therapy in Elsmere. She may need surgery.

Mother stated that she no longer resides in Millsboro. She goes there occasionally to check up on her house. Mother stated that Walter has attended Millsboro Elementary School since September of 2004. He was failing fourth grade at Long Neck Elementary School for the 2003–2004 school year. She believes that he missed only ten days of school that year. She admits, though, that she withdrew him from school approximately seven days prior to the end of the school year because she was going to be deployed. She tried hard to avoid him failing the fourth grade. He failed anyway.

Mother stated that she did not cooperate with Dr. Romirowsky or with a home study. She did what she thought was right as a soldier. She thought that the home study was intrusive. She wanted to uphold her constitutional rights. She also stated that Dr. Romirowsky did not show up for a home study.

With respect to a meeting scheduled with Dr. Fardman on September 3, 2004, mother stated that she was held up in Labor Day traffic. She did not call or say that she would be late. The meeting did not occur.

Mother stated that Walter has had discipline problems in school during the current school year. If they continue, she will seek another school for Walter.

Mother testified concerning an incident in May of 2004, when she pulled Walter out of school on his birthday. She anticipated that paternal grandparents were going to do something for him at school. As it turned it out, they threw a pizza party for him.

Mother admitted that Walter missed seven days of school for a urinary tract infection in January of 2005. A total of nine days had been missed in the 2004–2005 school year.

Mother stated that Kelly was enrolled in Cape Henlopen for only one week in September of 2003. She was placed in a resource class. Mother withdrew her from school because she felt that Kelly was being picked on. She then home schooled Kelly starting in December of 2003. From

September through December, she worked, herself, on Kelly's education, even though the child was not officially enrolled in any school.

Mother stated that she has a prescription for Darvicet for pain and Wellbutrin for panic attacks.

## 11. Dr. Samuel Romirowsky

Dr. Romirowsky testified a second time. He stated that he was initially retained to conduct a psychological evaluation of the children. Then, it expanded into a custody evaluation, by Order of the Court.

Dr. Romirowsky testified that his work almost exclusively involves custody evaluations. He often testifies in Court. He utilizes a parallel methodology, allowing all parties the opportunity to present information to him.

Dr. Romirowsky stated that he tried to begin a psychological evaluation in October of 2003. It was not actually done until January of 2004. He was not able to complete the evaluation to the extent that he wished, because mother was uncooperative. She informed him that she would not cooperate. Mother stated that she was going to stop participating due to her constitutional rights, her desire to consult with attorneys, and her desire to be evaluated at Walter Reed.

Dr. Romirowsky stated that he was able to complete an interview with mother, an interview with the children, an interview with paternal grandparents, psychological testing of paternal grandparents and the children, and a home visit at the home of paternal grandparents on August 26, 2004. He also reviewed the children's school records, DFS records, Court Orders, letters between the attorneys, records of a psychiatrist, and a cursory review of Carolyn Gover records.

Dr. Romirowsky conducted psychological testing of Kelly in February of 2004. She stated that father had ended their visits with paternal grandparents prior to his death, because he did not want them running the children's lives. She stated that she believes that paternal grandparents are primarily interested in seeing Walter rather than the two girls.

Kelly was more critical of Ruby than Earnest. She stated that Ruby hit her with a spoon and dug her nails into her. She further stated that Walter was hit by a yardstick. Because Kelly is afraid of the dark, Ruby locked her in a closet. Kelly was unable to remember the location of the closet, however.

Kelly informed Dr. Romirowsky that mother is a good parent. There is nothing she would change about mother. Kelly's statement seemed to contradict information in DFS records.

Kelly admitted that she is struggling in school. She expressed intense feelings of sadness, depression and anxiety.

Test results indicated an average intelligence, and an IQ of 100. It was particularly noticeable to Dr. Romirowsky that Kelly had limited knowledge of general and common information.

Kelly expressed significant anxiety and insecurity about people leaving her life. She is anxious about her living situation. She suffers from separation anxiety.

Kelly expressed a desire to not visit paternal grandparents, but her comments focused almost exclusively on Ruby. She said that incidents of abuse occurred when Earnest was not in the home.

Dr. Romirowsky pointed out that Kelly was vague about the timing of incidents of abuse. Dr. Romirowsky testified that he examined the home of paternal grandparents, and was unable to find a closet that could be locked.

Dr. Romirowsky evaluated Susan in February of 2004. She was a sixth grade student at Sussex Central Middle School.

Susan volunteered information to the doctor that the children were not visiting with paternal grandparents due to abuse that had been received. Dr. Romirowsky was concerned that this statement indicated that Susan had been prompted by mother as to what to say.

Allegations of abuse by Susan focused primarily on Ruby, but she also mentioned that Earnest had grabbed them around the collar. Susan mentioned an occasion when she and her sister were locked in a closet. She could not remember the location of the closet.

Susan expressed her opinion that her father was addicted to drugs at the time of his death. She sadly recalled a poor relationship with father's wife, Tina, who abused her and her brother with a belt.

Susan stated that there is nothing she would change about her mother. She mentioned that Earnest is short-tempered at times.

Susan mentioned an event that occurs at 8:00 p.m. each night at her house. She sees a sentry in a gray uniform walking back and forth in front of the home. She has also seen, on more than one occasion, a boy in Grotto's Pizza that no one else has been able to see.

Dr. Romirowsky stated that Susan is of average intelligence.

Susan is concerned that she will not get her mother's attention. There is sibling rivalry with Walter. Susan expressed a concern that mother has had to divert attention from her to Walter.

Dr. Romirowsky testified that Susan suffers from separation anxiety.

Ruby Harris submitted to a full battery of psychological testing. Dr. Romirowsky found her to be focused. Her thinking was logical and coherent. He observed no cognitive decline due to age. The results of a child abuse test indicate that it would be unlikely that she would engage in abuse. Other psychological testing supports the lack of an anger problem.

Dr. Romirowsky found Ruby to be well-intentioned. She does not have the goal of removing the children from their mother.

Dr. Romirowsky stated that Earnest Harris has a history of heart problems. He works as an electrician. There is no suggestion of cognitive impairment. He is cognitively rigid. It takes him a while to come around to someone else's point of view. A child abuse potential test indicates that it is very unlikely that Earnest would commit abuse.

Earnest is obsessive/compulsive, with great attention to detail. He suffers from mild anxiety and depression. He has talked about having a different relationship with his grandson than with his granddaughters.

Dr. Romirowsky described mother as being extremely guarded and distrustful. She fabricates information if she does not have it. Mother wants to keep the children under her care.

Dr. Romirowsky stated that there are legitimate questions as to the fitness of mother to parent children, due to her desire to keep them away from paternal grandparents. He is also concerned as to truancy issues, and the fact that mother has not complied with Court Orders.

Dr. Romirowsky stated that primary residential custody of the children should be with mother. However, in the interim, physical placement should be transferred to the Division of Family Services for a safety plan. He argued that they should have constant contact with mother, so that

they understand that no one is trying to take them away from mother.

Dr. Romirowsky opined that the children should resume contact with paternal grandparents on a graduated basis, with the assistance of a professional.

Dr. Romirowsky stated his belief that the children have been brainwashed. They are not credible as witnesses.

Dr. Romirowsky stated that mother is consistently shopping for someone who will agree with her, whether it is a lawyer, a counselor, an evaluator or a teacher.

*February 15, 2005 Witnesses:*

12. Roberta Ann Redefer

Roberta Ann Redefer is a registered nurse at Cape Henlopen School District. As part of her duties, she deals with absenteeism. She is familiar with mother and Kelly. She has talked with mother by telephone, and has met with her.

Ms. Redefer testified concerning Kelly's attendance in the 2003–2004 school year. During the period of September 8, 2003 through October 31, 2003, Kelly was absent twenty-seven days. Mother then withdrew her from school.

Ms. Redefer stated that she attempted to contact mother by telephone on October 14, October 15, October 17 and October 20, 2003. She left messages. On October 22, 2003, mother and Kelly came into school for a meeting with school officials. Kelly was going to come to school the next day, but did not. Ms. Redefer called mother on October 23 and 24, and left messages on October 27, October 28, October 29, October 30 and October 31, when Kelly did not appear for school. The child was absent on November 3 and November 4. The witness spoke with mother on November 4. Mother was upset, and said that she would withdraw the child from school.

On November 11, 2003, the Cape Henlopen School District wrote to mother, stating that Kelly did not live in the district. Mother was told that she needed to enroll the child in a proper school.

13. Terry Kansak

Terry Kansak is a fourth grade teacher at Long Neck Elementary School. During the 2003–2004 school year, Walter was in her class for a portion of the year, from September through the end of January.

Ms. Kansak stated that Walter is intelligent, but reserved. He has potential. He did not show a lot of emotion.

Will was frequently tardy and absent. He stayed after school to catch up. His homework was not being done at home.

On October 2, 2003, Walter received a progress report, which reflected poor grades. At the time, he had been tardy two days, and absent ten. A parent/teacher conference was scheduled for October 8, 2003. Mother did not appear. Mother also did not return a conference scheduling form.

Ms. Kansak stated that she was able to speak with mother on October 6, 2003, when mother was at school. She informed mother that Walter should stay after school for additional work. He did so until after Christmas break.

Ms. Kansak stated that report cards were issued on November 14, 2003. Walter received poor grades. From the period of October 2, 2003 through November 14, 2003, Walter was tardy six days and absent eight days. Letters were sent to mother in November of 2003 about Walter's absences.

The December 8, 2003 progress report indicated that Walter continued to receive poor grades, and was in danger of failing. Walter received unsatisfactory grades as

far as his homework, class work, and working independently.

Ms. Kansak set up a parent/teacher conference for December 11, 2003. Mother did not appear.

Ms. Kansak talked to mother in mid-December. Walter was present. Mother threatened to send Walter to a military school. When mother was leaving the room with Walter, she turned and winked at the teacher. Walter continued to have attendance problems.

Ms. Kansak stated that Walter frequently came to school without a coat. It was recommended to a counselor that Walter receive a donated coat. The teacher picked out a coat for Walter, and presented it to him. An assistant principal informed Ms. Kansak that Ruby Harris had donated the coats to the school, and giving one to Walter may cause a problem. Ms. Kansak had to take the coat back from Walter.

Ms. Kansak stated that Walter had some discipline problems, both inside and outside the classroom. At times, Walter seemed happy, but he was not always happy. He appeared thin. His clothes were not ragged, but at times it appeared that he had worn the same clothes repeatedly,

On January 29, 2004, Walter came to school and said that he was not supposed to be in Ms. Kansak's class. Later that day, she found that he had been moved to Mr. Rupert's class.

### 14. Carolyn Gover

Carolyn Gover was called to testify by mother. She has been a licensed professional counselor of mental health in Delaware since 1996. She is trained in family and individual counseling, both for children and adults. She testified that she started seeing mother and Kelly in 1997, although there was no contact for the period of 1998 through 2001. She began to see Walter and Susan in 2001.

Ms. Gover stated that when the children came to her house for counseling, they seemed appropriately dressed. They have never referenced any abuse or neglect. They always seemed concerned about Court, afraid that they would lose their mother.

Ms. Gover stated that in 2001, Kelly was withdrawn and depressed. Walter was rambunctious and getting into trouble. Susan was keeping everything inside her, and would not externalize things. She stated that all three children have adjustment disorders.

Ms. Gover stated her belief that the children had improved significantly over time. They have said that they fear paternal grandparents.

The children are well-mannered. Mother interacts well with the children. She believes that mother has done an incredible job as a mother. She does not see the children's behavior as different than the behavior of any other children.

Ms. Gover stated that this year, in particular, the children seem to be doing very well. They are well-nourished and well-dressed. There is no indication that mother has coached the children.

Ms. Gover testified that mother has reported incidents of getting attacked by men in her house.

### 15. Kevin Ruppert

Kevin Ruppert, a third grade teacher at Long Neck Elementary School, taught Walter during the latter part of the 2003–2004 school year. When Walter was first moved into his classroom, he met with mother and Walter in order to discuss his expectations with respect to schoolwork, homework and attendance. Mother gave her support.

During the first two weeks of school, Walter missed one homework assignment. The teacher immediately called another meeting to discuss this with mother and the principal. He had decided that he was not going to put up with missed assignments. Mother attended, and still gave her support. A plan was established on how to get papers home, using a book bag. Unfortunately, the plan was never consistently successful. Mother did not do her part of consistently retrieving the child's book bag from school before leaving with Walter. Walter failed to do enough homework, causing his grade to be negatively affected. Eventually, Mr. Ruppert abandoned the book bag plan. Responsibility for homework was again placed on Walter's shoulders.

When Walter continued to have problems getting his homework done, Mr. Ruppert began entering zeros into his grade book. The homework problem continued through the end of the school year. Walter's test grades were also generally low. Walter continued to have attendance problems throughout the school year.

When Mr. Ruppert attempted to schedule a parent/teacher conference with mother, mother did not attend, claiming that she did not receive notice.

Near the end of the school year, Mr. Ruppert informed mother that Walter would not pass. Mother responded that Walter needed to start taking responsibility.

During the fourth marking period of the school year, Walter had sixteen absences. He was tardy six times, and had four early dismissals. Walter was not in school the whole last week of the school year.

Mr. Ruppert described the incident in May of 2004, on Walter's birthday. He was absent that day. When his class arrived in the cafeteria, Grotto's was there for food for the class for lunch. The next day, Walter seemed to know that a party had been held for him, and that the food was provided by his grandparents. He told him that his mother had not sent him to school because she suspected something was going to happen.

16. Sheila Baumgardner

Sheila Baumgardner is the principal at Milton Elementary School in the Cape Henlopen School District. At the time she testified, Walter remained in the fourth grade for the 2004–2005 school year.

Ms. Baumgardner said that when Walter was initially enrolled, he was placed in the fifth grade. When records from Long Neck were obtained, it was determined that he should be in the fourth grade.

Ms. Baumgardner stated that Walter has experienced some discipline problems in the fourth grade. In October of 2004, he would not remain seated on the bus. Later that month, he hit a girl on the playground. In November, he kicked another student under the table in the library. In December, he took a teacher's overhead markers. In January he was hitting another student on the bus. In February, he was involved in fighting in the boy's bathroom. He received an out-of-school suspension.

Ms. Baumgardner testified that Walter has experienced fifteen absences since he started the school year. He has also had one unexcused tardy, and several early dismissals.

Ms. Baumgardner admitted that mother has cooperated with the school. She suggested that Walter may need outside counseling. She suggested that Walter needs a good role model.

*September 12, 2005 Witnesses:*

### 17. Catina Bright

Catina Bright is a fourth grade teacher at Milton Elementary School. She stated that she met Walter at the beginning of the 2004–2005 school year. His grades fluctuated between a B/C range. He had behavior issues. Generally, he missed five to seven days each month. He also had problems getting his homework done.

Ms. Bright started having Walter do homework at recess, to guarantee that it would be done.

Walter had a total of forty-seven absences during the school year. Fifteen absences occurred through January 26, 2005. There were thirty-two absences thereafter. From April through June of 2005, Walter had ten unexcused absences.

Ms. Bright commented that even though the 2005–2006 school year was only a few days old, Walter had already been tardy twice. At the time Ms. Bright testified, Walter had been promoted to the fifth grade.

### 18. Kathleen Capozzoli

Kathleen Capozzoli is the school nurse at Milton Elementary School. She stated that on the second day of the 2005–2006 school year mother brought Walter in, and said that Walter had chicken pox during the summer. Mother had many questions, particularly about whether Walter was still contagious. She stated that during the 2004–2005 school year, Walter often came to her office, stating that he wanted to go home. He seemed to be anxious while in school.

Ms. Capozzoli commented that mother has been cooperative about keeping Walter in school.

### 19. Brian Curtis

Brian Curtis is the principal at Mariner Middle School, where Susan is a student. There are no disciplinary issues in school for Susan. During the 2004–2005 school year, when Susan was in seventh grade, Susan had a total of twenty days of absences. Ten of those were unexcused. He stated that there was no definite policy at Mariner Middle School concerning the number of unexcused absences and whether a child will be promoted. Susan is now in the eighth grade.

### 20. Joniqua Combs

Joniqua Combs works at Turning Point/People's Place. Her duties include working with the Visitation Center.

She testified that mother contacted the center on June 23, 2005, after receiving a Visitation Order from the Court. She was upset about getting the Court's Order. Ms. Combs stated that mother never completed the intake process with respect to the children visiting with paternal grandparents. Paternal grandparents completed their intake on July 2, 2005.

### 21. Velma Barthelmess

Velma Barthelmess testified that she has known paternal grandparents for quite a few years. She lived with them for two and one-half years, after she had a fire in her house. She also knows the children. Currently, she lives down the street from paternal grandparents.

Ms. Barthelmess stated that the children visited the home while she lived there. Paternal grandparents provided excellent care. They took the children swimming and other places. They purchased clothing, toys and other gifts. They were "wonderful grandparents."

Ms. Barthelmess commented that there is no basement in paternal grandparents'

home. There is attic/storage space on the second floor, but there is no lock on the door.

Ms. Barthelmess stated that she never saw paternal grandparents lock the children in the closet or in the attic/storage space. She saw no verbal or physical abuse. She did remember hearing Kelly state on one occasion that she hated her grandparents.

22. Doris Harris

Mother testified again. Through her testimony, it was determined that she had provided the Court with an incorrect address on a previous occasion. She admitted, though, that she received the Court's Order of June 15, 2005. She read the order. Because the children did not want to visit the paternal grandparents, she did not follow the order. She never asked the Visitation Center about setting up an intake with the children.

Mother stated her belief that the Court's Order of June 15, 2005, violated the fourteenth amendment if it required her to make the children visit if they did not want to do so.

Mother admitted that she has done nothing to facilitate the attorney guardian *ad litem* meeting with the children. She also admitted that she has done nothing to facilitate Dr. Romirowsky in completing his work. She stated that she is not going to cooperate with Dr. Romirowsky.

Mother stated that she is disabled, and receives disability income from the United States government, in the amount of $3,200.00 per month. She testified for the second time that she was hurt in the line of duty, and received neck surgery in 2005. Later, she fell from the back of a truck, and her knee was injured. She had an operation in July of 2005.

Mother testified that the children were in school. Kelly is in the tenth grade at Sussex Central High School. She is sixteen years old, and her attendance is good. Susan is in the eighth grade at Mariner Middle School. Her attendance is good. Walter attends Milton Middle School. He has two unexcused tardiest. Mother commented that the children are still seeing Ms. Gover.

*September 13, 2005 Witnesses:*

23. Sheila Baumgardner

Ms. Baumgardner testified a second time. With respect to the attendance policy at Milton Elementary School, she stated that if a child is absent, he or she needs to bring in a note within two days, with a stated reason for the absence. If the reason is not acceptable, then the absence is unexcused. If there are more than three days of unexcused absences, then the case can be referred to a truancy officer.

The witness stated that Walter missed forty days of school in the 2004–2005 school year. A letter was sent to mother on February 3, 2005, after Walter missed eleven days.

In the 2005–2006 school year, Walter has been tardy on September 12 and September 13, the last two days of the hearing. Ms. Baumgardner stated that she had numerous conversations with mother during the last school year concerning tardiness. She had a conversation with her the previous day.

Ms. Baumgardner further testified that she is concerned that Walter was making himself sick during the past school year. He manipulates mother to get out of school.

24. Amy Jo Polidore

Amy Jo Polidore, a staff member at the office of the attorney guardian *ad litem*, testified as to the many letters that she

has mailed on behalf of Mr. Casey to mother. None of the letters have been returned. She has placed several phone calls to mother on behalf of Mr. Casey. She has received no return letters or phone calls from mother.

### 25. Dr. Samuel Romirowsky

Dr. Romirowsky testified a third time. He stated that he had been contacted by the office of paternal grandparents' attorney about scheduling the remainder of his evaluation. He provided two dates in late August and one date in early September, 2005. A letter from the attorney's office to mother provided three dates. The letter also said that funds to complete the evaluation would be advanced by paternal grandparents. Mother never contacted him. As a result, he has never been able to complete his evaluation as to mother.

Dr. Romirowsky stated that he had wanted to see the children alone at the home of paternal grandparents in September of 2005. He also wanted to see the children alone at mother's house in September of 2005. He left messages with mother to bring the children to the home of paternal grandparents, but there was no response. He drove to mother's residence to try to find mother. He was unsuccessful.

Dr. Romirowsky testified concerning his evaluation of Walter in February of 2004. He stated that the child was cooperative, but highly protective about information concerning mother. He was very interested in making sure that Dr. Romirowsky knew that mother was a good mom.

Walter's criticisms of paternal grandparents were very broad. He said that mother had told him that he was meeting with Dr. Romirowsky to explain what paternal grandparents had done to him. Without prompting, Walter started telling the doctor about incidents of abuse by Ruby. He

stated that she broke a yardstick over his nose, and hit his legs with a flyswatter. He could remember no details. He said that his mother reminded him of the incidents, and said that he should tell the witness about them.

Walter told Dr. Romirowsky that he was aware that Ruby had locked his sisters in the closet in the basement. He said that he used a credit card to free them from the basement, so they could escape from the house. He could not remember where they went when they left the house.

Walter said that he believes that Ruby killed his father. He said that his mother also believes that Ruby killed his father.

Walter informed Dr. Romirowsky that he was afraid to visit his paternal grandparents.

Dr. Romirowsky observed that during the testing of Walter, the child used words and phrases too complicated for a nine-year-old. He stated that he thought mother's best quality was her "integrity." He stated that paternal grandparents "lacked integrity." Walter stated that he suffers from headaches, and believes that they are coming from radiation in the house.

Dr. Romirowsky believes that Walter is extremely aggressive and angry. He is mistrustful. He is of average intelligence, with an IQ of 101.

Dr. Romirowsky suggests that Walter has developed a conduct disorder. This a condition where a child develops sociopathic tendencies. He is defiant and oppositional. He does not want to behave according to socially expected behavior. Walter does not seem to want to listen to anyone. He wants to protect his mother. He is conflicted about his family situation. He is a parentified child, and is not free to behave as a child. Walter seems to be taking cues from mother. If mother says

to do something, then it is okay. If mother says no, then it is not okay. Mother's attitude trumps everything else.

Dr. Romirowsky stated his belief that all three children have been brainwashed. They are fabricating stories. They want to protect mother.

Walter seems to be putting most of the blame on Ruby. He seems to be affectionate, though, toward Earnest.

Dr. Romirowsky believes that all three children are being psychologically abused in mother's home. They are psychologically damaged. He contends that they will grow up as psychologically and psychiatrically damaged adults. He is concerned that they will be social deviants. He believes that mother can no longer be left with the responsibility to safeguard the children. However, he recognizes a close bond between mother and the children. He believes the children should have psychotherapy. The situation is no different than if the children had been in a cult.

Dr. Romirowsky stated that mother is not malicious. He believes that mother loves the children.

On cross-examination, Dr. Romirowsky stated that the children did not tell him that the locking in the basement incident occurred at someone else's house. He further stated that it was difficult to diagnose mother, because she would not cooperate.

26. Ruby Harris

Ruby Harris has been married to Earnest Harris for twenty-one and one-half years. She is seventy-five years old. In the past eleven years, she and Earnest Harris have lived in Harbeson.

Ms. Harris had three children of her own. They all died if cystic fibrosis. Ruby and Earnest Harris have six other grandchildren. They see them almost weekly, eating meals, and doing other activities together.

Ruby Harris stated that she met mother when she and Earnest Harris were married. Mother had been married to father for about six months. At that time, she and mother had a good relationship. The good relationship lasted from 1984 through 1996. It deteriorated when mother and father divorced.

Ruby Harris testified that she helped care for Susan when Walter was born. She helped care for Walter for a short time when mother needed doctor's care after Walter was born. Mother was hospitalized for several weeks for psychiatric care. Ruby Harris also helped care for Walter when mother went back to work. When Walter was nine months old, mother allowed paternal grandparents to take him to Florida for a visit.

Ruby Harris stated that when Walter was approximately one year old, she and her husband cared for the child for nine weeks, when mother joined the National Guard. Following the divorce of mother and father, mother withheld contact with the children for three months. As a result, paternal grandparents filed for grandparent visitation in 1996. After a consent order was entered, they were afforded visitation every other Saturday. This lasted until father's death in 2002.

All three children came to live with paternal grandparents in 1999. Kelly had alleged that mother had abused them. DFS became involved. Susan and Walter stayed from March of 1999 through August of 1999. They then returned to mother's care. Kelly stayed through March of 2000. At that time, grandparent visitation commenced again.

Ruby Harris testified that father's widow did not allow the children to come to his funeral. The widow stated that if they

would not come see him during his life, they should not come after death. The children did attend the viewing, however. One week after the funeral, mother denied grandparent visitation.

Ruby Harris stated that during 2003, Walter began to call paternal grandparents secretly. She admitted that she has gone to Walter's school a few times, even though she realized that she should not.

In September of 2003, Walter called and said that he could not talk to them anymore. Mother had found out that he was calling them. There has been no contact with the child since then.

Ruby Harris stated that she attempted to set up supervised visits at the Visitation Center with the children as a result of the Court's June, 2005 Order. He efforts were not successful. She also attempted to set up counseling through the Court's June, 2005 Order. This was also not successful.

With respect to allegations of abuse raised by the children, Ruby Harris testified that she never hit Kelly with a spoon. She never locked Kelly in a closet. In fact, there are no locks on closet doors in the house.

Ruby stated that she never locked Kelly outside. She never burned Kelly with a match. She never tore Kelly's clothes off because of what she was wearing. She did, though, make Kelly change her clothes once because they were inappropriate.

Ruby Harris testified that neither she nor Earnest Harris had smoked marijuana. They never kicked Susan in the stomach. They never locked Susan outside in the cold. They never slapped Walter in the head with a yardstick. They never locked Walter outside in the cold. She never scratched or burned Walter. She never committed any acts of abuse against the children. She also testified that Earnest Harris had never done any of these things.

*October 17, 2005 Witnesses:*

27. S. Keith Parsell

S. Keith Parsell, the owner of funeral homes in Sussex County, testified that he handled father's funeral. He stated that father's widow would not permit the service to be started until all three children were removed. Paternal grandparents had nothing to do with the removal of the children.

28. Earnest Harris

Earnest Harris, seventy-two years of age, stated that he and Ruby Harris have been married for twenty-one years. They have had no children together.

After mother and father married, he continued to work with father, and saw him daily. Once the children were born, he saw them frequently. The children did many things with him and Ruby Harris.

Earnest Harris stated that when Walter was five days old, mother needed help caring for him. They cared for him in their home. They also cared for Walter when mother was in basic training for the military. They continued to be involved with the children in their activities, even after mother and father were divorced. Visitation was cut off by mother after father died.

On one occasion, they were able to secure a visit with Walter, with the assistance of the police. Walter appeared to enjoy it. However, after three hours the police came to get Walter.

Earnest Harris stated that he continued to have lunch with Walter at school, until that, too, was stopped by mother. Paternal grandparents were denied contact with the children by telephone. However, se-

cretly, Walter continued to contact paternal grandparents.

Earnest Harris confirmed that Ruby never abused the children, and the children never complained about abuse from Ruby. He also confirmed that there are no locks on the closets in their home, and the home has no basement.

Earnest Harris stated that there had been no visits or contact with the children pursuant to recent orders of the Court.

Earnest Harris wishes to restore a relationship with the children. He believes that the children need counseling to get them back on track. He believes the children may have a better life if they were placed with the State. At the same time, he believes the children should have contact with mother.

Earnest Harris stated that he has a close relationship with his other grandchildren. Those grandchildren at one time had a close relationship with Kelly, Susan and Walter.

29. Barbara Whitcomb

Mother called Barbara Whitcomb, who has known her since 1985 or 1986. She stated that mother puts the welfare of the children first. She has never seen mother harm the children. She has been to mother's home several times.

Ms. Whitcomb stated that mother interacts with the children very well. The children are good students and are dressed fine. They are well provided for. Her own children seen Kelly, Susan and Walter a few times each month.

30. Doris Harris

Mother testified on rebuttal as to an occasion in October of 2003 when Walter did not go to school due to storm damage at the home. She also testified that Susan went to Tennessee on one occasion on a trip to go to a wedding. She missed seven to nine days of school.

Mother testified that Kelly is currently a straight A student at Cape Henlopen High School. Mother did not bring Kelly's grades to Court.

31. Walter Harris

The Court interviewed Walter. He is in the fifth grade at Milton Elementary School, getting A's and B's. He likes making friends. He stated that before attending Milton Elementary School, he attended Long Neck Elementary School.

Walter described to the Court many of the personal belongings that he has in his bedroom, including electronic items. He talked about the three horses and goat at his home. Primarily, his sisters ride the horses. However, he helps care for them.

Walter described the various relatives that he visits with. When the Court attempted to ask him whether he had been previously calling his paternal grandparents on the phone, he very quickly denied that this had happened.

Walter informed the Court that his attorney guardian *ad litem* is working with child social services in this case. Walter stated his belief that people are getting paid off by Ruby and Earnest Harris. He further stated that people often get paid off in Court cases. In this case, he suggested that both the attorney guardian *ad litem* and the Judge might be receiving money to side with Ruby and Earnest Harris.

Walter further stated that teachers and principals in his schools have been paid by Ruby and Earnest Harris in order to obtain information. He is aware that Ruby and Earnest Harris and their relatives sold parcels of real estate that they did not even own, and that is how they received money in order to pay people off.

Walter informed the Court that at 9:00 p.m. the previous evening, he and his mother found footprints on their property. Their dog was barking. Fresh mud was on the steps. They heard their screen door opening a slight bit. Walter suggested that it might have been a hit man coming to their home, in order to kill them. The hit man left when mother went to the door. Mother said that the next time such a thing happens, she will call the police. Because it was already 9:00 p.m., she did not call the police at that time, because it was too late.

Walter stated that two months previously, a similar thing happened, but at the door on their deck. He saw an arm leaning across a dog kennel and a fence jiggling. He and his mother took a walk in the woods in order to check things out.

Walter stated that on one occasion, his mother saw an unknown man standing in their horse pasture.

Walter informed the Court that he is worried that things at Ruby and Earnest Harris's house could get bad again. He remembers nothing good about his visits with them. He stated that Ruby would "neglectfully" take the children places, like beauty salons, and would not pay any attention to them.

Walter argued that the children need to move on, rather than participate in these Court cases.

Walter admitted that he did not know that there was an Order from the Court, that he and his sisters were supposed to be visiting with paternal grandparents.

Walter stated that his mother had not coached him with respect to his testimony. However, he believes that Ruby and Earnest Harris use bribery and intimidation. Walter was critical of Ruby and Earnest Harris for buying him many of the things that he asked for. This was an example of bribery and intimidation.

Walter stated that Ruby and Earnest Harris locked his sisters in the attic on one occasion, for an hour and a half. They also neglected his sisters by leaving them at a skating rink for three and one-half hours. He informed the Court that this was child abandonment.

Walter suggested that there are often power outages at his house, which affect the ability of the family to receive messages on their answering machine.

Walter informed the Court that none of the children in the family want to visit with paternal grandparents. He worried that if his mother wants to move to another state, she would have to drive the children back to Delaware to visit.

Walter stated that it is his belief that Ruby killed her own children to get insurance money. He believes that Ruby told him once that she got over $260.000.00. He is concerned that Ruby might have the same idea about him and his sisters.

Walter described one occasion when his mother received a Court Order concerning visitation. Because mother believed that the Court Order was a fake one, prepared by Ruby and Earnest Harris, she did not follow it.

## 32. Susan Harris

Susan is fourteen years old, and in the eighth grade at Mariner Middle School. She said that she receives A's and B's, and said that school is easy. She participates in winter cheerleading and soccer.

Although Susan was not clear on the job of the attorney guardian *ad litem*, she is sure that he is on the side of Ruby and Earnest Harris. She believes that what this case is about, is trying to get the children to live with paternal grandparents.

Susan stated that visits have not taken place because the children do not want to visit.

With respect to her father's funeral, she claims that the children were given only limited time at the viewing. They were then forced to leave. The next day, at the funeral, their stepmother, as well as Ruby and Earnest, prevented them from attending the funeral. Ruby informed Susan that if the children did not want to see their father during his life, then why would they want to see him after he died.

Susan stated that she is aware of Court Orders requiring the children to visit with Ruby and Earnest Harris. However, she also pointed out that since they put the children through hell for years, abused them, and took them away from their mother, she does not want to visit with them. Susan was unclear as to the details of how paternal grandparents removed the children from the care of mother.

When asked why she did not speak with the attorney guardian *ad litem* on more than one occasion, she equated it to giving Osama Bin Laden a second chance to bomb America.

33. Kelly Harris

Kelly is in the ninth grade at Sussex Central High School. She is sixteen years of age. She claimed to have lots of friends, and enjoys hanging out with them. She likes school, and is doing well this year. She has good attendance. She intends to go to college.

Kelly likes to play golf. She and her mother enjoy horseback riding, and caring for the horses.

Kelly stated that she knows who the attorney guardian *ad litem* is. She was not aware that she should have been meeting with him on several occasions. She is aware that she should have been visiting with paternal grandparents. She claimed that the visitation did not take place, because the children have been so busy.

Kelly at first stated that she would not be opposed to visiting, if there was time. Then, she complained that Ruby and Earnest Harris have imposed things like religion on the children. Ruby and Earnest are pushy people. This drives Kelly crazy. She has no good memories of visiting with them. She is willing to visit with them when she thinks the time is right. She has no clue as to why Ruby and Earnest want to visit. She suggested that their motivation is actually to see Walter.

Kelly stated that she lived with paternal grandparents at one time. She cannot remember why the children were not living with mother. They were unable to live with father, because their stepmother did not want them in the house.

Kelly stated that at her father's funeral, when their stepmother removed them from the funeral, Ruby and Earnest did not help them get back inside.

Kelly stated that she does not really talk about the case with her mother. She attends counseling once every two or three weeks.

### LEGAL STANDARDS

*Petition for Stay/Termination of Grandparent Visitation*

Delaware law requires the Court to determine visitation with a grandparent in accordance with Title 10, Section 1031 of the *Delaware Code*. It states, in part, as follows:

> In any civil action within the jurisdiction of this Court and upon the petition of a person properly before it, the Court may:
>
> (7) Upon petition thereto, grant grandparents reasonable visitation

regardless of marital status of the parents of the child or the relationship of the grandparents to the person having custody of the child; providing however:

a. That when the natural or adoptive parents of the child are cohabiting as husband and wife, grandparental visitation may not be granted over both parents' objection. The trier of fact shall make the ultimate decision based upon the best interest of the child.

b. That wherever practicable, the Court shall provide that the maternal grandparents' visitation time shall occur when the child is placed with or has visitation with the mother and the paternal grandparents' visitation time shall occur when the child is placed with or has visitation with the father, irrespective of the place of residence of the parents/or the grandparents, unless otherwise agreed to by all parties involved.

This statutory visitation authorizes the Court to grant reasonable grandparental visitation, but not over the objection of both natural or adoptive parents cohabiting as husband and wife. Further, it encourages the scheduling of such visitation concurrent with the visitation of respective parents. Neither situation is present in the pending case, since father is deceased.

■ Grandparental visitation is to be evaluated based on "the best interests of the child." *Rogers v. Trent*, Del.Supr., 594 A.2d 32, 33 (1991); *Rosemary E.R. v. Michael G.Q.*, Del.Supr., 471 A.2d 995, 996 (1984). The burden is on the petitioning grandparent "to establish by a preponderance of the evidence that visitation with

such grandparent is in the best interests of the child. . . ." *Id.* at 996.

Some Family Court decisions have commented on the unique relationship between a grandparent and grandchild, and the potential benefit of such a relationship to the grandchild. See *Sanchez v. Parker*, Del. Fam., File No. 93–09822, 1995 WL 489146, Connor, J. (June 20, 1995) and *Sadie L.E v. Victoria E and Dino R.E*, Del.Fam., File No. 96–36087, 1997 WL 728291, Crowell, J. (May 30, 1997)."

On June 5, 2000, the United States Supreme Court issued its decision in the matter of *Troxel v. Granville*, 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). In that case, the Court reviewed a statute of the State of Washington, which permitted the awarding of visitation rights to any person, at any time, when visitation would serve a child's best interests. The case involved a request by paternal grandparents, Jennifer and Gary Troxel, to visit with their grandchildren, Isabelle and Natalie Troxel. The children's mother, Tommie Granville, opposed the visitation. The children's father, and the son of Jennifer and Gary Troxel, was deceased.

The U.S. Supreme Court recognized "that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody and control of their children."[3] The Court found that the Washington statute, as applied to litigants before the Court, unconstitutionally infringed on that fundamental parental right. The Court found the statute to be "breathtakingly broad," since it permitted "any person" to petition for visitation rights, at any time. The statute further allowed such visitation rights to be awarded based on a judicial determination of what was in the best interests of a child.

---

**3.** *Troxel* at 66, 120 S.Ct. 2054.

The Court pointed out that the statutory language "effectively permits any third party seeking visitation to subject any decision by a parent concerning visitation of the parent's children to state-court review. Once the visitation petition has been filed in court and the matter is placed before a Judge, a parent's decision that visitation would not be in the child's best interests is accorded no deference." [4]

The Court further pointed out that the Washington statute contained "no requirement that a court accord the parent's decision any presumption of validity or any weight whatsoever. Instead, the Washington statute places the best-interest determination solely in the hands of the Judge." [5]

The Court further stated that, "[s]hould the Judge disagree with the parent's estimation of the child's best interests, the Judge's view necessarily prevails. Thus, in practical effect, in the State of Washington, a court can disregard and overturn *any* decision by a fit custodial parent concerning visitation whenever a third party affected by the decision files a visitation petition, based solely on the Judge's determine of the child's best interests." [6]

In finding that the awarding of visitation to the Troxels was "an unconstitutional infringement on Granville's fundamental right to make decisions concerning the care, custody and control of her two daughters," [7] the Court pointed out that there was no finding that Granville was an unfit parent. The Court held that, "so long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the family to question the ability of that parent to make the best decisions concerning the rearing of that parent's children." [8] The Court criticized the Washington trial court for awarding grandparent visitation, while giving "no special weight at all to Granville's determination of her daughter's best interests." [9] The Court further recognized that the Washington Court had actually applied the opposite presumption, finding that grandparent visitation "should be granted unless the children would be 'impact[ed] adversely.' " [10]

Finally, the Supreme Court stated as follows:

"In an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren. Needless to say, however, our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial in any specific case, it is for the parent to make in the first instance. And, if a fit parent's decision of the kind at issue here becomes subject to judicial review, the Court must accord at least some special weight to the parent's own determination." [11]

Subsequent to the *Troxel* decision, Courts in many states have been faced with the issue of how to apply the decision of the Supreme Court to cases that come before them. Generally, those Courts have compared the language of their own

---

4.  *Troxel* at 67, 120 S.Ct. 2054.

5.  *Troxel* at 67, 120 S.Ct. 2054.

6.  *Troxel* at 67, 120 S.Ct. 2054.

7.  *Troxel* at 72, 120 S.Ct. 2054.

8.  *Troxel* at 68, 120 S.Ct. 2054, citing *Reno v. Flores,* 507 U.S. 292, 304, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

9.  *Troxel* at 69, 120 S.Ct. 2054.

10.  *Troxel* at 69, 120 S.Ct. 2054.

11.  *Troxel* at 70, 120 S.Ct. 2054.

statutes with the language of the Washington statute, as well as the similarity of the facts in *Troxel*, as compared to the facts before them, in determining the applicability of the *Troxel* holding.[12]

### Petition for Rule to Show Cause

The legal standard applicable in the consideration of a Petition for a Rule to Show Cause was discussed by Chancellor Chandler in the decision of *Dickerson, et. al. v. Castle, et. al.*, Del.Ch., C.A. No. 10256, Chandler, C., 1991 WL 208467 (October 15, 1991) (Mem.Op.), as follows:

"A motion to show cause why the defendants should not be held in contempt is addressed to the discretion of this Court. *Fatemi v. Fatemi*, Pa.Super., [371 Pa.Super. 101] 537 A.2d 840 (1988) ... This Court must use the contempt power in a manner appropriate to the situation so as to best resolve the conflict at hand. *City of Wilmington v. A.F.S.C.M.E.*, Del. Ch., 307 A.2d 820 (1973).

While in a criminal contempt proceeding any penalty for contumacious behavior is punitive in nature, this is a proceeding for civil contempt. The only purpose for finding the defendants in contempt and assessing a penalty here would be to coerce them to obey the Order. *Delaware State Bar Association v. Alexander*, Del.Supr., 386 A.2d 652 (1978) ... In order to bring this coercive power to bear on the defendants, this Court must first find by clear and convincing evidence that a violation of the Court Order has taken place. *Feliciano v. Colon*, 697 F.Supp. 26 (D.P.R. 1987) ... For a party to be found in contempt for violation of the Court's Order that violation must not be a mere technical one, but must constitute a failure to obey the Court in a "meaningful way." *Palmigiano v. DiPrete*, 700 F.Supp. 1180 (D.R.I.1988) ... Even if a finding of contempt is made, the Court need not impose sanctions for failure to comply with its Order if it perceives that the party is making a good faith effort to remedy the problems which necessitated the action. *Albro v. County of Onondaga, New York*, 681 F.Supp. 991 (N.D.N.Y.1988)."

### Dependency/Neglect Petition for Custody

Pursuant to Title 13, Section 721(e) of the *Delaware Code*, a custody proceeding between a parent and any other party is not to be decided in favor of the other person, unless the Court finds the following:

1. That the child is dependent or neglected.
2. That it is in the best interests of the minor child that the child should not be placed in the custody of the parent.

Pursuant to Title 10, Section 901(8) of the *Delaware Code*, a dependent child is "a child whose physical, mental or emotional

---

12. For example, see *Gestl v. Frederick*, 133 Md.App. 216, 754 A.2d 1087 (2000); *Fitzpatrick v. Youngs*, N.Y. Fam. Ct., 186 Misc.2d 344, 717 N.Y.S.2d 503 (2000); *Galjour v. Harris*, 2000–2696 (La.App. 1 Cir. 3/28/01), 795 So.2d 350; *Mozroll v. Boman*, 2000 WL 1198005 (Conn.Super. Aug 02, 2000) (NO. FA 920044266S); *In re: G.P.C.*, Mo.App., 28 S.W.3d 357 (2000); *Rubano v. DiCenzo*, Me. Supr., 759 A.2d 959 (2000); *Rideout v. Riendeau*, Me.Supr., 761 A.2d 291 (2000); *Lopez v. Martinez*, 85 Cal.App.4th 279, 102 Cal.Rptr.2d 71 (2000); *Jackson v. Tangreen*, App.Div., 199 Ariz. 306, 18 P.3d 100 (2000); *Scott v. Scott*, Okla.Supr., 19 P.3d 273 (2001); *In re: R.D.Y.*, 51 S.W.3d 314 (Tex.App.-Hous.(1 Dist.) Apr 12, 2001) (NO. 01–99–01073–CV); *Lilley v. Lilley*, Tex. Court of Appeals, 43 S.W.3d 703 (2001); *Zeman v. Stanford*, 789 So.2d 798, 2001 WL 495901 (Miss. May 10, 2001) (NO. 2000 CA–00757–SCT); *Wilburn v. Wilburn*, 144 Ohio App.3d 279, 760 N.E.2d 7 (Ohio App. 2 Dist. Jun 15, 2001) (NO. 18564); and *Crafton v. Gibson*, 752 N.E.2d 78 (Ind.App. Jul 11, 2001) (NO. 40A04–0011–CV–490).

health and well-being is threatened or impaired because of inadequate care and protection by the child's custodian, who is unable to provide adequate care for the child, whether or not caused by the child's behavior ...". Pursuant to Title 10, Section 901(11) of the *Delaware Code,* a neglected child is "a child whose physical, mental or emotional health and well-being is threatened or impaired because of inadequate care and protection by the child's custodian, who has the ability and financial means to provide for the care, but does not or will not provide adequate care; or a child who has been abused or neglected as defined by Section 902 of Title 16 ...". The term "adequate care" is defined by Title 10, Section 901(1) of the *Delaware Code* as "a type and degree of personalized attention that will tend to advance a child's physical, mental, moral, emotional and general well-being."

In determining the best interests of the child, the Court is required to consider all relevant factors, including eight specific factors set forth in Title 13, Section 722(a) of the *Delaware Code.*[13]

### FINDINGS/ORDER

*Petition for Stay/Termination of Grandparent Visitation*

■ A review of mother's Petition for Stay/Termination of Grandparent Visitation indicates that mother has raised two allegations. First, she contends that paternal grandparents have previously abused the children during visits. Second, she contends that a counselor has reported that reinstituting visitation with paternal grandparents would seriously endanger the children's future emotional and psychological development.

With respect to the issue of abuse, the Court is unable to find by a preponderance of the evidence that acts of abuse have been committed by either Earnest Harris or Ruby Harris. Although there were several statements made by the three children as to allegations of abuse, the Court does not find those statements to be credible. The descriptions of abuse are not logical, and fall apart when efforts are made to obtain details. Furthermore, the Court believes that mother has made significant efforts in order to encourage the children to report incidents of abuse, which never occurred. The Court believes that the children are maintaining their claims in an effort to protect their mother.

The Court is also unable to find that reinstituting the visitation would seriously endanger the children's future emotional and psychological development. The Court is unable to find that the evidence

---

**13.** Title 13, Section 722(a) of the *Delaware Code* states that the Court shall determine the legal custody and residential arrangements for a child in accordance with the best interests of the child. In determining the best interests of the child, the Court should consider all relevant factors including: (1) The wishes of the child's parent or parents as to his or her custody and residential arrangements; (2) The wishes of the child as to his or her custodian(s) and residential arrangements; (3) The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with the parent of the child, any other residents of the household or persons who may significantly affect the child's best interests; (4) The child's adjustment to his or her home, school and community; (5) The mental and physical health of all individuals involved; (6) Past and present compliance by both parents with their rights and responsibilities to the child under Section 701 of Title 13 of the Delaware Code; (7) Evidence of domestic violence as provided for in Chapter 7(A) of Title 13 of the Delaware Code; and (8) The criminal history of any party or adult member of a household and shall take into consideration whether a party or adult member of a household has pled guilty or no contest to or is convicted of a criminal offense.

supports such a statement. In fact, the evidence submitted to the Court indicates that issues concerning the children's emotional and psychological development are attributable to mother's actions. The Court believes that it is mother who has created this fantasy that the children are victims of abuse. It is mother who has given the children reason to believe that it is acceptable behavior to ignore authority. It is mother who has caused the children to have to endure years of pointless litigation.

The Court does not wish to minimize, however, the fact that each of the children is severely distressed concerning his or her involvement in this dispute amongst family members. Kelly expressed significant anxiety and insecurity to Dr. Romirowsky. Susan, too, is anxious. Her report of seeing a uniformed sentry patrolling her yard at night is disturbing. The fact that Walter would allege that Ruby Harris has killed her children for the insurance money, and may do the same to him and his sisters, is almost beyond belief, as is his claim that a hit man has visited his home.

The psychological issues confronting the children need to be addressed. They are not adequately being addressed now. The Court is unable to conclude that severing contact with paternal grandparents, thereby validating mother's actions, would be an appropriate way to address the difficulties of the children.

As indicated previously, *Troxel* places great deference on the decisions of a fit parent in determining whether visitation with a third party should occur. The U.S. Supreme Court criticized the procedure whereby a trial court would second guess a visitation decision of a fit parent. The Court pointed out that a trial court must give special weight to the best interests determination of such a parent.

This Court takes very seriously its obligation to support the proper decisions of parents with respect to the upbringing of their children. However, in this case, the Court cannot support mother's decisions with respect to contact of her children with paternal grandparents. The decisions of mother are not those that would normally be made by a fit parent. Her decisions have been irrational. The Court is unable to conclude that they are intended to benefit the children. Instead, they benefit mother in her attempt to isolate her children from the family of their deceased father.

In looking at mother's decisions concerning visitation, the Court has attempted to give them special weight. Even so, the Court cannot support them, since they make little sense. Mother's decisions are based on falsified information. They are not rational. Accordingly, under *Troxel,* the Court cannot support mother's determinations.

The Court cannot find by a preponderance of the evidence that the Petition for Stay/Termination of Grandparent Visitation should be granted. The petition is denied. Visitation shall continue, as originally set forth in this Court's Order of June 12, 1996, every other Saturday, from 10:00 a.m. through 6:00 p.m., beginning February 11, 2006. Transfers of the children shall occur in front of the Food Lion, at the Nanticoke Crossing Shopping Center. The parties shall communicate on a regular basis concerning the children. Paternal grandparents shall be permitted reasonable telephone access to the children.

*Petition for Rule to Show Cause*

█ It is the finding of the Court, by clear and convincing evidence, that mother has violated the Permanent Consent Order, dated June 12, 1996, as well as the

December 11, 2002 Commissioner's Order. Both Orders provided for grandparent visitation. The evidence supports the finding that mother violated the Orders by preventing all three children from visiting with paternal grandparents. The excuses alleged by mother, too numerous to state here, are emphatically rejected by the Court.

The Court finds that a finding of contempt is necessary in this matter, in order to coerce mother to comply with Orders of this Court. Mother has a significant history of ignoring the Court. The Court further finds that mother's violation is not merely technical. Her absolute refusal to comply with the Orders of this Court has been significant and long-standing.

It is the determination of the Court that mother must comply with all existing Orders of this Court. She shall also pay attorney's fees and costs incurred by paternal grandparents, in an amount to be determined by the Court. An affidavit of attorney's fees and costs shall be submitted to the Court by paternal grandparents within thirty days of the date of this Order.

*Dependency/Neglect Petition for Custody*

█ After reviewing the evidence in this matter, the Court is unable to find by a preponderance of the evidence that the children should be placed in the custody of either paternal grandparents or the Division of Family Services. There is no doubt that the Court has significant concerns about decisions made by mother, especially with respect to visitation. The Court has already determined that those decisions are not those of a fit parent. The Court also has concerns about mother's efforts on behalf of the education of the children. The constant changing of schools, the lack of support for teachers and school administration, and the incidents of repeated absenteeism, are not benefiting the children. Yet, after reviewing the definitions of dependent and neglected children under Delaware law, and the best interests factors, the Court does not believe that custody should be removed from mother.

A legitimate argument could be made that Kelly, Susan and Walter are dependent in the care of their mother. Lack of attention to their education, the example she is setting for failing to comply Orders of this Court, and the fabrication of information concerning abuse at the hands of paternal grandparents, could constitute a lack of adequate care on mother's part. Evidence seems to suggest that this inadequate care is affecting the children's mental and emotional health. However, a finding of dependency is not a sufficient basis for a transfer of custody. The Court must also find that such a transfer would be in the best interests of the children. The Court will review each of the best interests factors:

1. *The wishes of the child's parent or parents as to his or her custody and residential arrangements* (DEL.CODE ANN. TIT. 13, § 722(a)(1) (1999)): Mother wishes to maintain custody of her three children. Paternal grandparents seem somewhat confused as to the issue of custody. On the one hand, they have suggested that custody be awarded to the Division of Family Services. On the other hand, they have suggested that they might be willing to have custody, although they feel that they will be more successful with Walter, than with his two sisters.

2. *The wishes of the child as to his or her custodian(s) and residential arrangements* (DEL.CODE ANN. TIT. 13, § 722(a)(2) (1999)): Clearly, the children wish to continue to live with their mother.

3. *The interaction and interrelationship of the child with his or her parents, grandparents, siblings, persons cohabiting in the relationship of husband and wife with the parent of the child, any other residents of the household or persons who may significantly affect the child's best interests* (DEL.CODE ANN. TIT. 13, § 722(a)(3) (1999)): The children are very loyal to mother. They have each expressed that they maintain a positive relationship with her. The children speak highly of the various activities that they engage in with mother. Mother ensures that the children maintain contact with relatives on her side of the family.

Currently, except for court-ordered visitation with paternal grandparents, which has not been occurring, there is no contact with relatives on father's side of the family.

4. *The child's adjustment to his or her home, school and community* (DEL.CODE ANN. TIT. 13, § 722(a)(4) (1999)): Generally, the children seem well-adjusted to their home. They are involved in community activities, and seem to enjoy them. School is a problem, at least with respect to Kelly and Walter. This is probably the primary area where mother has let the children down. She is not supportive of school officials. Her solution for addressing educational issues is to move the children from school to school, and classroom to classroom.

5. *The mental and physical health of all individuals involved* (DEL.CODE ANN. TIT. 13, § 722(a)(5) (1999)): The evidence indicates that mother, Kelly, Susan and Walter all have psychological issues which need to be addressed. There is no indication that either Earnest Harris or Ruby Harris are in need of similar treatment.

6. *Past and present compliance by both parents with their rights and responsibilities to the child under Section 701 of Title 13 of the Delaware Code* (DEL.CODE ANN. TIT. 13, § 722(a)(6) (1999)): The most glaring item of evidence with respect to this factor is that mother has repeatedly ignored prior Court Orders with respect to visitation and access to the children by their attorney guardian *ad litem.*

7. *Evidence of domestic violence as provided for in Chapter 7(A) of Title 13 of the Delaware Code* (DEL.CODE ANN. TIT. 13, § 722(a)(7) (1999)): Although there were allegations of domestic violence during the time that mother and father were together, there is no recent evidence of domestic violence.

8. *The criminal history of any party or adult member of a household and shall take into consideration whether a party or adult member of a household has pled guilty or no contest to or is convicted of a criminal offense.* (DEL.CODE ANN. TIT. 13, § 722(a)(8) (2004): The criminal history of the parties is not an issue in this matter.

After considering the best interests factors, the Court is unable to find that it would be in the best interests of the minor children that they be placed out of their mother's care. Despite the many problems associated with that care, the Court believes that far more damage would be done to the children if they were placed elsewhere. The Dependency/Neglect Petition for Custody is hereby denied.

There is one further matter that the Court wishes to address. The children are

in need of counseling. The Court does not believe that the counseling being provided by Carolyn Gover is adequate. The Court directs that the attorney guardian *ad litem* select a new counselor for the children, after consultation with both mother and paternal grandparents. Mother shall ensure that the children attend counseling. The counselor shall be provided with a copy of this Order. The cost of counseling shall be split equally between the parties. The attorney guardian *ad litem* shall remain involved in this case, until relieved by further Order of this Court.

This Court's Temporary Guardianship Order, dated January 20, 2006, is hereby rescinded, to the extent that it awarded temporary guardianship to Earnest and Ruby Harris, and to the extent that it required visits occur at the Georgetown Family Visitation Center.